

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00545-CV

_____

IN THE INTEREST OF E.T., A CHILD

_____

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-763055-25

_____

Before Kerr, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

After a bench trial, the trial court terminated Father's parental rights to his daughter E.T.[1]—a now-five-year-old child whom he has never met—finding two termination grounds:

- endangering conduct, Tex. Fam. Code Ann. § 161.001(b)(1)(E); and

- criminal conduct resulting in his conviction, imprisonment, and inability to care for E.T. for two years after the termination petition's filing, *id.* § 161.001(b)(1)(P);

and that termination was in E.T.'s best interest, *id.* § 161.001(b)(2). In three issues, Father complains that the evidence is legally and factually insufficient to support these three findings. *See id.* § 161.001(b)(1)(E), (P), (2). We will affirm.

## I. Background

Father "grew up smoking marijuana," using methamphetamine and K2,[2] and "do[ing] pretty much every drug you can think of." He has two children with his ex-wife (Susan), but throughout their lives, Father has been in a "revolving door" in and out of prison and has had a largely "non-existent" relationship with both now-adult children.

---

[1]We use initials to identify the child, we refer to family members by familial relation, and we use pseudonyms for other parties. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]K2 is a synthetic cannabinoid with a hallucinogenic effect. *In re C.L.-F.*, No. 02-22-00021-CV, 2022 WL 2353091, at *1 & n.2 (Tex. App.—Fort Worth June 30, 2022, no pet.) (mem. op.).

Mother has also struggled with using drugs, including methamphetamine and heroin. In 2019, Mother and Father were both sober and lived together, and in August of that year, Mother told Father that she was pregnant.

The next month, Father was arrested for burglary of a building. Mother visited Father twice while he was in jail, but she "cut him off" after the second visit. Father pleaded guilty and was sentenced to three years' confinement. While Father was confined, E.T. was born in April 2020.

Father was released from prison in early 2021, but he was rearrested in July for violating his parole conditions. He was again released in 2022 and lived in a halfway house. When not incarcerated, Father tried only once to contact Mother but "got kind of the vibe that they didn't want [him] around." He also once contacted her sister, who refused to intercede, calling him "nothing but the DNA donor."

At some point, Mother met Stepfather, and they had a child, A.T., in April 2022. That same month, Father was arrested for striking a coworker with a two-by-four board. He pleaded guilty to aggravated assault with a deadly weapon and was sentenced to five years' confinement. Father recalled writing only one or two letters to Mother, but he also admitted that he "was letting [G]od just do his things. I didn't have no contact. . . . I didn't want to bother nobody."

Mother, Stepfather, A.T., and E.T. lived together. E.T.—who had never known of Father—called Stepfather her father. Mother and Stepfather began using illegal drugs, and in May 2023, the Texas Department of Family and Protective Services

received a referral after Mother was detained in connection with a retail theft. To responding police, Mother had appeared to be under the influence of something, and she admitted to having drug paraphernalia in her car. A.T. (age 1) and E.T. (age 3) were also in the car, where police found methamphetamine. They and the car "were 'dirty' and had an odor." The Department opened a case, initiated a safety plan, and began extensive efforts to help the family.

During this time, Mother became pregnant again. Mother attempted an at-home birth at a friend's house to avoid the Department's further scrutiny. But because of complications, Mother and her newborn went to the hospital, where Mother tested positive for drugs, including fentanyl. The baby also tested positive for drugs, and on January 23, 2024, the baby's hospital contacted the Department. Two days later, the Department filed a petition to terminate the rights of Mother, Father, and Stepfather; removed the children; and placed them in the same foster home.[3]

After the Department notified Father of the suit, a permanency specialist first spoke with him by phone in March 2024. Father told her that Mother had told him she was pregnant in August 2019 but that he was unaware of Mother's relapse. DNA testing eventually confirmed that he was E.T.'s father. At the Department's request, Father completed parenting and anger-management classes in prison.

---

[3]All three children have been raised as if they have the same biological father—Stepfather.

On January 3, 2025, Mother's parental rights were terminated to E.T., and her and Stepfather's parental rights were terminated to their two younger children.[4] Because of Father's incarceration, OCOK[5] did not allow E.T. to visit him. OCOK also determined that it would not be appropriate to inform E.T. about Father as she knew only Stepfather as her father, so it was determined that Father could write E.T. letters that OCOK would hold onto for potential use in a therapeutic setting "to introduce the concept of [Father] . . . to E.T." OCOK's permanency specialist testified that about a year after their first phone call—in March 2025—Father began writing weekly letters to either E.T. or her, which OCOK has held.

Father's case was severed into a new cause and proceeded to trial in July and September 2025. Father refused to be brought to court with a bench warrant and remotely appeared by Zoom for part of the trial. The Department called three witnesses: OCOK's permanency specialist; Father's ex-wife; and Father. Father called no additional witnesses. E.T.'s guardian ad litem and her court-appointed special

---

[4]Mother and Stepfather both signed affidavits voluntarily relinquishing their parental rights. The trial court accordingly terminated their rights. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(K). Stepfather appealed, but this court has since affirmed the termination order. *See In re E.T.*, No. 02-25-00031-CV, 2025 WL 1717139, at *1 (Tex. App.—Fort Worth June 19, 2025, no pet.) (mem. op.).

[5]OCOK (Our Community Our Kids) is a private provider of community-based care that contracts with the Department. *See In re Z.R.*, No. 02-25-00268-CV, 2025 WL 3181160, at *3 n.10 (Tex. App.—Fort Worth Nov. 13, 2025, no pet.) (mem. op.).

5

advocate (CASA) also testified. The ad litem explained why she thought that terminating Father's rights would be in E.T.'s best interest.

The trial court signed a termination order, finding, among other things, that the Department had proved the endangering-conduct and criminal-conduct grounds and that termination was in E.T.'s best interest. *See id.* § 161.001(b)(1)(E), (P), (2).

## II. Burden of Proof and Standard of Review

Before turning to Father's sufficiency challenges, we set out the applicable burden of proof and standard of review.

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. §§ 161.001(b), .206(a); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Due process demands this heightened standard because "[a] parental[-]rights termination proceeding encumbers a value 'far more precious than any property right.'" *In re E.R.*, 385 S.W.3d 552, 555 (Tex. 2012) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982)). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent–child relationship, the party seeking termination must establish, by clear and convincing evidence, that (1) the parent's actions satisfy just one of the many predicate grounds that are listed in Family Code Section 161.001(b)(1), and (2) termination is in the child's best interest under Section

161.001(b)(2). Tex. Fam. Code Ann. § 161.001(b)(1), (2); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

Regarding Subsection 161.001(b)(1) grounds, the supreme court has articulated an important qualification: if the trial court finds for terminating under Subsection (b)(1)(E)—as the trial court did here—an appellate court must review that ground on appeal because it can have potential collateral consequences for other children the parent may have. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (providing that a prior termination under Subsection (E) is a ground for terminating parental rights to a different child); *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) ("[I]f a court of appeals affirms the termination on . . . [Subsection (E)], it must provide the details of its analysis."). Termination may not be based solely on the child's best interest as determined by the factfinder under Section 161.001(b)(2). *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

## A.    Legal sufficiency

In evaluating the evidence for legal sufficiency in parental-termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the party seeking termination proved both the particular ground for termination and that termination is in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment, and

7

we resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. We also must disregard all evidence that a reasonable factfinder could have disbelieved, in addition to considering undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* In doing our job, we cannot weigh witness-credibility issues that depend on the witness's appearance and demeanor; that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.*

## B.     Factual sufficiency

We must perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support terminating a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In a factual-sufficiency review, we give due deference to the factfinder's findings and do not supplant the factfinder's judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated an alleged ground and that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so

significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### III. Endangering Conduct

In his first issue, Father argues that the evidence is legally and factually insufficient to support the trial court's endangering-conduct finding. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). We disagree.

### A. Law

"Endanger" means to expose to loss or injury, or to jeopardize a child's emotional or physical health. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under Subsection (E), we ask whether evidence exists that the parent engaged in conduct or knowingly placed the child with someone who engaged in conduct—including acts, omissions, or failures to act—that endangered the child's physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(b)(1)(E); *J.T.G.*, 121 S.W.3d at 125. Subsection (E) requires not just a single act or omission but rather a voluntary, deliberate, and conscious course of conduct. *J.T.G.*, 121 S.W.3d at 125.

"As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the [child's] physical and emotional well-being." *In re P.W.*, No. 02-24-00211-CV, 2024 WL 4293564, at *8 (Tex. App.—Fort Worth Sept. 26, 2024, no pet.) (mem. op.) (quoting *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort

9

Worth 2004, pet. denied)). The specific danger to the child's well-being may be inferred from parental misconduct alone, and courts may look to parental conduct both before and after the child's birth. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (stating that a factfinder may infer from past endangering conduct that similar conduct will recur). Additionally, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. *J.T.G.*, 121 S.W.3d at 125.

We identify some of the pertinent parental conduct that we can consider in an endangering-conduct analysis:

- "Domestic violence, want of self[-]control, and propensity for violence," *In re A.L.W.*, No. 04-24-00874-CV, 2025 WL 2158523, at *4 (Tex. App.—San Antonio July 30, 2025, pet. denied) (mem. op.) (quoting *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.)); *see also J.O.A.*, 283 S.W.3d at 346;

- Conduct toward another child or a domestic partner, *In re L.A.*, No. 02-25-00368-CV, 2025 WL 3683989, at *4 (Tex. App.—Fort Worth Dec. 18, 2025, no pet. h.) (mem. op.) (first citing *J.O.A.*, 283 S.W.3d at 345; and then citing *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied));

- Illegal drug use, *see J.O.A.*, 283 S.W.3d at 345;

- "[C]riminal conduct, convictions, imprisonment, and their effects on a parent's life and ability to parent," *In re J.B.*, No. 14-20-00766-CV, 2021 WL 1683942, at *5 (Tex. App.—Houston [14th Dist.] Apr. 29, 2021, pet. denied) (mem. op.);

- Beyond the fact of "mere imprisonment," the totality of a "[a] parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists,"

10

*In re J.F.-G.*, 627 S.W.3d 304, 312–13 (Tex. 2021) (quoting *Boyd*, 727 S.W.2d 533–34);

- Failure to provide stable housing and income, *In re K.J.*, No. 02-25-00093-CV, 2025 WL 1600219, at *6 (Tex. App.—Fort Worth June 5, 2025, pet. denied) (mem. op.);

- Mental-health issues, *In re J.P.-L.*, 592 S.W.3d 559, 583 n.26 (Tex. App.—Fort Worth 2019, pet. denied); and

- Lack of significant parent–child contact, *In re A.J.D.*, No. 02-13-00183-CV, 2013 WL 5781478, at *4 (Tex. App.—Fort Worth Oct. 24, 2013, no pet.) (mem. op.).

## B. Evidence and analysis

The record contains evidence of each of these above types of endangering conduct. We begin with Father's history and pattern of conduct leading to his incarcerations and being away from his children, including E.T.

Father's ex-wife, Susan, described his involvement with the criminal-justice system throughout his life as "[c]onsistent. Never a downtime. And if there was, it was two or three months at a time." She described Father's going through a revolving door in and out of prison, and she testified that he had been incarcerated for most of his children's lives: He had "[l]ittle to no[]" involvement with their lives.

Susan testified that when Father was not incarcerated, he had abused drugs, including using marijuana, in front of the children. Once, during 2012, Father's drug use caused him to lose touch with reality. Father thought his son was a demon, and he held the family in a room for three days, keeping a knife beside him. She did not think

11

that Father had ever recovered from the 2012 incident and that he had suffered long-term mental health issues. They permanently separated in 2013.

Susan testified that Father's conduct had caused long-lasting trauma in her and her children. She said that Father had a strained relationship with their son and no relationship with their daughter. And she testified that her own relationship with Father was "toxic."

When Father was released from prison in 2021, he told Susan about wanting E.T. to be in his life. She told him it "probably wasn't going to happen if he didn't get his stuff together." When Father again contacted her about the Department's removal of E.T., she blocked him. She testified that she would be concerned if Father had any contact with E.T. because of "the mental toll that it takes on one having to deal with him," and she stated, "I just don't think it would be healthy."

Father testified that he has been sober since 2017, but his pattern of conduct leading to his repeated incarceration has continued. While Father lived with Mother, she became pregnant. Instead of trying to provide a stable home for a future child and two recovering drug users, within a month of Mother's telling him she was pregnant, Father returned to criminal activity—burgling a building—and was confined when E.T. was born.

Upon his release in 2021, instead of trying to be in E.T.'s life, he violated the terms of his parole and was again imprisoned. And after being released in 2022, he quickly returned to his criminal ways—assaulting a co-worker—and was convicted

and incarcerated for that violent crime. Thus, Father has been incarcerated throughout the termination proceeding.

Father testified that he hoped to be released sometime in late January 2026. But he acknowledged that when he is eventually released, he will not be able to immediately provide stable housing for E.T. He plans to move into a cousin's trailer, which does not have the capacity to also house E.T., so he estimated that it might take another six to eight months to set up a place for her.

When the Department asked Father how he thought things would be different this time, Father said he "got somebody's life at stake." The Department immediately questioned him about having "somebody's life at stake before"—referring to Susan and their two children—and Father asserted that he "wasn't in [his] right mind" then. But he claimed that he had learned techniques in prison to do better this time.

Father claimed to have not used drugs since 2017, and he took an anger-management and a parenting class in prison, had been writing letters to E.T. since March 2025, and had been meditating and praying daily in prison. But such evidence cannot be viewed in isolation. *See J.F.-G.*, 627 S.W.3d at 312–13; *see also In re R.J.*, 579 S.W.3d 97, 116 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). "A parent's efforts to improve or enhance parenting skills are . . . relevant in determining whether a parent's conduct results in endangerment under Subsection (E)." *In re J.M.*, No. 02-21-00346-CV, 2022 WL 872542, at *15 (Tex. App.—Fort Worth Mar. 24, 2022, no pet.) (quoting *In re M.M.M.*, No. 01-21-00269-CV, 2021 WL 5365102, at

13

*11 (Tex. App.—Houston [1st Dist.] Nov. 18, 2021, pet. denied) (mem. op.) (citation modified)). But "evidence of improved conduct, especially of short duration, does not conclusively negate the probative value of a long history of irresponsible choices." *Id.* (quoting *M.M.M.*, 2021 WL 5365102, at *11 (citation modified).

Father has consistently chosen conduct resulting in confinement. And the Department presented evidence of Father's past conduct toward his now-traumatized adult children and ex-wife, his nonviolent and violent conduct toward others that had led to his repeated confinement, his failure to obtain stable housing, his failure to provide for his family, and his overall lack of contact with or concern for E.T. *See J.F.-G.*, 627 S.W.3d at 313; *Boyd*, 727 S.W.2d 533–34.

No evidence shows that Father had known that E.T. was in a deplorable situation with Mother and Stepfather. But likewise, no evidence shows that before March 2025—around a year after first speaking with OCOK—Father made any real effort to know anything about E.T., her life, or her environment, or to offer her financial, emotional, or other support.[6] In his own words, he described his efforts, stating,

> I think I wrote one or two letters to [Mother's address] just to -- yeah, I didn't want to bother nobody, I didn't want to interrupt anything that was going on because I didn't want anybody to make the wrong turn with that child in the car or, you know, anything. So I was just letting -- letting the flow go.

---

[6]When the Department first contacted Father, he "stated that he didn't know anything about [her]."

14

In short, the Department did not present a case of Father's mere incarceration, standing alone; rather, it presented evidence of a history and repeating pattern of criminal conduct, convictions, and confinement creating familial instability and endangering his ex-wife and their two children—and now E.T—with no definite end in sight. *See J.F.-G.*, 627 S.W.3d at 313; *J.B.*, 2021 WL 1683942, at *5. Considering the totality of Father's history and giving the deference we must pay to the factfinder's credibility determinations, on this record a reasonable factfinder—whether viewing the evidence in the light most favorable to the judgment or weighing all the disputed evidence, *see In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018)—could have formed a firm belief or conviction that Father's course of conduct endangered E.T.'s well-being, *see* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *H.R.M.*, 209 S.W.3d at 108; *J.F.C.*, 96 S.W.3d at 266.

We thus hold that the evidence is both legally and factually sufficient to support the trial court's Subsection (E) finding.[7] *See J.F.-G.*, 627 S.W.3d at 313; *K.J.*, 2025 WL 1600219, at *6; *J.B.*, 2021 WL 1683942, at *5. We overrule Father's first issue.

---

[7]In light of this holding, we need not reach Father's second issue challenging the evidentiary sufficiency of the trial court's Subsection (P) finding. *See* Tex. R. App. P. 47.1; *N.G.*, 577 S.W.3d at 237 n.1; *In re W.H.*, No. 02-24-00291-CV, 2024 WL 4705128, at *2 n.4 (Tex. App.—Fort Worth Nov. 7, 2024, pet. denied) (mem. op.).

## IV. Best Interest

Concerning Father's third issue, we likewise hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

### A.    Law

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *A.C.*, 560 S.W.3d at 631. Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

[1]    the [child's] desires . . . ;

[2]    the [child's] emotional and physical needs[,] . . . now and in the future;

[3]    the emotional and physical danger to the child now and in the future;

[4]    the parental abilities of the individuals seeking custody;

[5]    the programs available to assist these individuals to promote the [child's] best interest . . . ;

[6]    the plans for the child by these individuals or by the agency seeking custody;

[7] the stability of the home or proposed placement;

[8] the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

[9] any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807.

These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**B.     Evidence and analysis**

In weighing the *Holley* factors, we conclude that the evidence strongly shows a history of acts and omissions indicating that the existing parent–child relationship was not a proper one and that Father was not able to provide for E.T.'s current or long-term emotional and physical needs. *See* 544 S.W.2d at 372.

**1.  E.T.'s desires**

The Department presented no direct evidence from E.T. Under such circumstances, the first *Holley* factor is ordinarily "considered to be neutral, weighing

17

neither for nor against the trial court's best-interest finding." *See In re C.W.*, No. 02-23-00414-CV, 2024 WL 637264, at *9 (Tex. App.—Fort Worth Feb. 15, 2024, pet. denied) (mem. op.). But the State presented circumstantial evidence of E.T.'s desires by presenting evidence that she had bonded with her foster family, who had cared for her and her half-siblings. Thus, the factfinder could have considered the evidence of E.T.'s bond with her foster family as "a reasonable proxy for [E.T.'s] desires." *In re A.J.D.-J.*, 667 S.W.3d 813, 833 (Tex. App.—Houston [1st Dist.] 2023, no pet.); *see also In re O.O.*, No. 05-24-00456-CV, 2024 WL 4403748, at *7 (Tex. App.—Dallas Oct. 4, 2024, pet. denied) (mem. op.). The first factor supports the best-interest finding.

### 2. E.T.'s emotional and physical needs

The evidence at trial showed that E.T. had shown "signs of ADD" but had been improving through weekly behavioral therapy. In December 2024, she and her two half-siblings were placed with a foster family that has provided consistency and structure in her life: E.T. was thriving in kindergarten, had her own room, enjoyed being a big sister, called her foster parents "Mom and Dad," and behaved like a normal five year old—an improvement since her removal.

We have said that "children need permanency and stability," *In re G.V., III*, 543 S.W.3d 342, 350 (Tex. App.—Fort Worth 2017, pet. denied), and we have stressed that a child needs "a stable home and engaged parents" who are not constantly incarcerated. *In re G.M.*, No. 02-23-00061-CV, 2023 WL 4243349, at

*8 (Tex. App.—Fort Worth June 29, 2023, pet. denied) (mem. op.) (quoting *In re M.J.*, No. 02-23-00026-CV, 2023 WL 3643673, at *11 (Tex. App.—Fort Worth May 25, 2023, no pet.) (mem. op.)). Further, the trial court could have reasonably inferred from Father's repeated history of incarceration that his confinement-causing conduct would likely continue and that he could not meet E.T.'s current and future physical and emotional needs. *See G.M.*, 2023 WL 4243349, at *8. This factor weighs in favor of termination.

### 3. Emotional and physical danger to E.T.

By all accounts, Father was not using drugs when he met Mother and did not know that Mother had started using drugs because he had been imprisoned and not in contact with her or E.T. But the trial court was free to consider Father's prior drug use, his conduct toward Susan and their children, and his pattern of criminal conduct, including at least one violent act, that could endanger E.T. physically and emotionally were she placed with him. *See In re A.A.*, No. 13-25-00157-CV, 2025 WL 2475157, at *12 (Tex. App.—Corpus Christi–Edinburg Aug. 27, 2025, no pet.) (mem. op.) ("The trial court was also permitted to measure Father's future conduct by his past conduct in determining whether termination of his parental rights was in the children's best interest." (citing *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied))); *see also L.A.*, 2025 WL 3683989, at *10 (holding that a parent's violent criminal conduct leading to confinement supports best-interest finding).

Susan, Father's ex-wife, testified to his dangerous past conduct toward her and their children. She testified to the emotional strain that his conduct—including his consistent involvement with the criminal-justice system—had placed on their relationships and said that Father had caused "long-lasting traumatic effects" to them. She expressed concern for E.T. were Father to have contact with her, stating, "I just don't think it would be healthy."

By contrast, the Department's proposed permanent placement presented a safe and stable home for E.T. with her half-siblings and the adoption-motivated foster parents with whom she had formed strong bonds. *See G.M.*, 2023 WL 4243349, at *8. This factor supports termination.

### 4. Parental abilities of the individual seeking custody

E.T.'s young age places a premium on the parental abilities of those seeking custody and on the stability of her future home. *See In re K.W.*, No. 02-24-00082-CV, 2024 WL 3461749, at *6 (Tex. App.—Fort Worth July 18, 2024, no pet.) (mem. op.). The CASA advocate and guardian ad litem both testified that E.T.'s foster parents had been meeting E.T.'s needs. The foster parents were in the process of adopting E.T.'s two younger half-siblings, and they also wanted to adopt E.T. Father, on the other hand, testified that he wanted to meet E.T. but acknowledged that he could not provide immediate housing or support for her upon his release. He thought "it would be like a process . . . maybe like . . . a three or five-month deal to where she would get

to know [him] . . . and gradual[ly] move in with [him]," and he thought it would take six to eight months to have a place for her to stay.

The court heard evidence from Susan about Father's poor parenting and his having traumatized their two children as he went in and out of prison—conduct that continued before and after E.T. was born. *See A.A.*, 2025 WL 2475157, at \*12; *E.D.*, 419 S.W.3d at 620. Father claimed to have not been in his right mind when he failed to uphold his parental responsibilities to his older children but claimed that he had learned new techniques in prison so that he could be different upon his next release. Both the CASA advocate and the guardian ad litem testified that E.T.'s placement that was meeting her needs would be at risk if the court waited for Father "to prove that he is, indeed, a changed person." The ad litem testified that E.T. "is safe, she is stable, she is happy, she is with her biological [half-]siblings," and she stated, "I believe it's in her best interest that she remain there."

The trial court was entitled to consider the evidence of Father's repeated convictions leading to confinement and his inability to meet E.T.'s basic needs—like housing—for the foreseeable future. *See In re A.F.R.*, No. 01-20-00355-CV, 2020 WL 6140181, at \*11 (Tex. App.—Houston [1st Dist.] Oct. 20, 2020, pet. denied) (mem. op.). This factor favors termination.

### 5. Programs available to promote E.T.'s best interest

Father completed parenting and anger-management classes in prison. But because of his incarceration, Father could not complete the Department's services and

programs that could have helped him to meet E.T.'s basic needs. In contrast, E.T.'s foster parents were taking her to therapy sessions and were helping her do well in school. The foster parents were motivated to adopt her and her younger half-siblings. On balance, this factor weighs in favor of termination. *See In re B.K.G.D.*, No. 01-20-00057-CV, 2020 WL 3821086, at *13 (Tex. App.—Houston [1st Dist.] July 2, 2020, pet. denied) (mem. op.) (concluding that "parental abilities" and "programs available" factors weighed in favor of termination where parents had completed "some, but not all, of" their required services and potential adoptive parents were able to meet child's needs); *In re J.O.*, No. 11-19-00088-CV, 2019 WL 3822198, at *2–3 (Tex. App.—Eastland Aug. 15, 2019, no pet.) (mem. op.) (holding evidence sufficient to support best-interest finding where record reflected that adoption-motivated foster parents met the child's needs).

### 6. Plans for E.T.

Father had difficulty articulating his future plans for E.T. He talked about a "process to where she would have to meet [him], talk to [him], maybe like go through a three or five-month deal to where she would get to know [him] . . . and gradual[ly] move in with [him]." But he asked the trial court, "What do you think?" And then Father talked about needing to save up for several months to find a place where he and E.T. could live together.

The Department's plan for E.T. was for her current foster parents to adopt her and to keep her with her half-siblings if the trial court terminated Father's parental

22

rights. And the evidence showed that the foster parents wanted that outcome. The guardian ad litem testified that the court should not delay the Department's permanent solution to see if Father really had become a "changed" person. She explained that E.T. was "in a placement that [was] meeting all of her needs" and should be allowed to remain in that safe, stable environment. "Stability and permanence are paramount in the upbringing of children." *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied). This factor favors termination.

### 7. Stability of the home and proposed placement

Under the Texas Family Code, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tex. Fam. Code Ann. § 263.307(a). At the time of trial, E.T. "had been placed in a stable home, and the plan was for her to be adopted into that family." *See In re V.S.*, No. 02-22-00063-CV, 2022 WL 2252775, at *6 (Tex. App.—Fort Worth June 23, 2022, pet. denied) (mem. op.) (citation modified). Evidence about placement plans and adoption is relevant to the child's best interest. *In re J.A.B.*, No. 2-06-404-CV, 2007 WL 3037720, at *6 n.40 (Tex. App.—Fort Worth Oct. 18, 2007, no pet.) (mem. op.). The testimony of the CASA advocate and guardian ad litem established that E.T. "interacts well with her placement family and that her needs . . . are amply met." *See V.S.*, 2022 WL 2252775, at *6. In contrast, Father's criminal conduct—including a recent act of violence against a coworker—resulted in his confinement for nearly all

E.T.'s life, leaving him with no relationship with her and no concrete plan to provide for her basic emotional and financial needs. This factor weighs in favor of termination.

## 8. Acts or omissions indicating that the parent–child relationship was not proper

A month after Mother told Father that she was pregnant with E.T., he committed a crime and went to prison. He made little to no effort to contact Mother or to find out about E.T. after she was born. When he was released from prison, he was rearrested. After being released, he committed a violent act and was again imprisoned. Not until after the Department contacted Father had he tried more consistently to communicate with E.T. by writing letters to her. In short, despite having repeated opportunities to be a supportive parent, Father instead chose to commit crimes that led to his confinement and absence from E.T.'s life. He has never met E.T., and she does not know him. Father's acts and omissions led to his having no relationship with E.T. and tended to demonstrate that his proposed relationship with E.T. at some point after he is released from prison would not be a proper one. This factor weighs in favor of termination.

## 9. Excuses

Father did not offer much to excuse his conduct. He gave no explanation for committing a crime during Mother's pregnancy and offered no good explanation for striking his coworker with a two-by-four. He had simply assumed that two

Spanish-speaking coworkers were plotting against him, so he attacked: "I . . . got in the wrong situation and took care of the situation wrong."

Although Father testified that Mother had cut him out of her life, he did not explain his lack of effort to establish contact with E.T. or to develop a relationship with her before the Department's removal. Father testified that he was "letting the flow go" and not "want[ing] to bother nobody." But the trial court could have reasonably found that such statements reflected his lack of concern for E.T. rather than an excuse.

Father also acknowledged that he wanted to provide for E.T., but he could not explain how his conduct would differ from how he had treated his other children. He claimed to have not been in his right mind when he was responsible for them, said that he had been sober since 2017, and said that he had learned techniques to make better decisions. But even assuming Father quit using drugs in 2017, he did not explain why he had twice committed crimes and ended up in prison after impregnating Mother—knowing that he was about to be a father for the third time. The trial court was entitled to find that this factor weighed in favor of termination.

## C. Holding

Considering the record as a whole, we conclude that the *Holley* factors weigh against Father. We hold that a reasonable factfinder could have formed a firm belief or conviction that termination of Father's parental rights was in E.T.'s best interest and that the evidence was both legally and factually sufficient to support the trial

court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *H.R.M.*, 209 S.W.3d at 108; *J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 25. We overrule Father's third issue.

## V. Conclusion

Having overruled Father's first and third issues, and without reaching his second, we affirm the trial court's termination order.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  January 22, 2026